UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA

vs.

EDWARD GALPIN

CRIMINAL NO. 3:21-CR-26; 3:21-CR-32(JAM)

May 7, 2022

## DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

    This case requires the reconciliation of seemingly incompatible truths. There is no doubt that these crimes are abhorrent. There are multiple victims spanning from children who have been revictimized for years as images of their abuse are recirculated to new victims that Mr. Galpin himself victimized, recorded, and published. There are families and a community that feel betrayed by Mr. Galpin's actions. Broken lives ripple through this case and no one disputes the propriety of a severe sentence. Simultaneously, few cases better exemplify the Second Circuit's observation that the applicable United States Sentencing Guideline "is fundamentally different from most and that, unless applied with great care, can lead to unreasonable sentences that are inconsistent with what [18 U.S.C.] § 3553 requires." *United States v. Dorvee*, 616 F.3d 174, 184 (2d Cir., 2010). Egregious though it is, these offenses do not reauthor the measure of human depravity. Yet Mr. Galpin's guidelines are calculated at a literal chart-topping level 52 which becomes a 43 because it exceeds the top of the sentencing table. *Presentence Report*, ¶ 64, 67. The real and legitimate human impulse to protect children from the most sordid crimes will be vindicated in this sentencing by operation of law: a non-negotiable 15-year mandatory minimum sentence. "[G]reat care," however, is warranted is to ensure that the law's requirement of a sentence "not greater than necessary" is similarly vindicated.

    The epicenter of this case is a broken man who is only beginning to grapple with the fractures in his life that brought him to this offense. But while he has only begun, he has done so in a big way.

The real story in this case is not—at this point—what precisely led Mr. Galpin to do this. The real story is the effort Mr. Galpin has made to look inward, to earnestly begin the process of rehabilitation, to demonstrate authentic remorse, and to take full and unqualified responsibility for his offense in-spite-of its painfully ignominious character. Denial casts a long shadow in cases of this nature: Mr. Galpin's acknowledgment of his wrongdoing and efforts to grapple with it have eliminated that phenomenon from this case. The fact that Mr. Galpin has so vigorously set off down rehabilitation's path is evidence he will conclude the journey following 15 years.

By all accounts, Mr. Galpin is a spectacularly introverted and reserved man. Yet, he engaged in group therapy when that resource was available to him at Wyatt. A psychologist's evaluation indicates he has a "fair to good" to prognosis for rehabilitation after Mr. Galpin laid bare his psyche over Zoom meetings. *Sealed Exhibit* A, Report of Dr. Robert Thompson. He has read the available victim impact statements and sent a letter of apology to the United States Attorney's Office's victim coordinator for appropriate dissemination. *Exhibit* F. He has agreed to forfeit his entire share of the equity of his home--$30,000—to restitution. Where restitution is 'how you say you're sorry,' this is a meaningful apology. Mr. Galpin has exhausted the universe of possibilities in the realm of remorse and potential rehabilitation. A sentence of 15 years is sufficient but not greater than necessary to accomplish the purposes of sentencing.

I.   **HISTORY AND CHARACTERISTICS.**

Mr. Galpin is in a state of metamorphosis. He entered this case—and this offense—with an unbelievably taciturn disposition. He was so reserved that counsel had to have Mr. Galpin's wife call in advance of legal visits to insist that he prepare himself to answer open-ended questions from counsel. He was the type of person who would answer any question about himself, no matter how

raw, no matter how open-ended, no matter how unthreatening and welcoming of conversation the question was, Mr. Galpin's answer was "fine." This is the first hurdle in his path to rehabilitation.

The purpose of this memorandum is not to identify an event or events as the cause of Mr. Galpin's wrongdoing. The purpose of this memorandum is present an inventory of hypotheses—hypotheses that are only available by virtue of Mr. Galpin transcending his emotional blocks. He will have the laboratory of the BOP for at least the next decade to determine which are valid and which are not. But he will go into that laboratory armed with notes, structure, and insights to do the work and efficiently and find accurate, workable answers. Perhaps not every hypothesis will ultimately be relevant or accurate. But the investigation will by thorough.

Put differently, Mr. Galpin is capable of being a person other than the one the brought him before this Court. His efforts at achieving insight in his conduct demonstrate this as well as his commitment to rehabilitation. To do seemingly requires Mr. Galpin to revisit the assumptions that have defined his sense of self and consequent decision-making processes. To that end, the defense emphasizes anecdotes from Mr. Galpin's upbringing. Moreover, it addresses the differing perspectives that those close to him have on his family. Those differing perspective demonstrate that there is room for Mr. Galpin to rethink many aspects of his life; they give rise to inferences that suggest this could be a worthwhile endeavor.

1. **A façade or normalcy.**

Most of Mr. Galpin's upbringing is, in his telling, unremarkable. He was raised in a middle class, two-parent home; he and his siblings seemingly had their basic needs met; and he attained some college and a career. To this day, Mr. Galpin describes his parents as hard-working people who furnished their children with vacations, food, and recreational sports common in the middle class. *Letter of Edward Galpin*, 1, *Exhibit* B. With respect to some of the suggestions made by his

3

ex-wife, Nicole, and uncle, Scott Miterko, Mr. Galpin views this largely as a matter of perspective but it open to re-examining over time.

### 2. Is this what a healthy upbringing produces?

Perhaps the more the telling facts, however, are the objective ones. they have their own narrative power. Mr. Galpin is the oldest of four brothers. He lost one brother to a heroin overdose that shocked the family and another is described as estranged as a result of mental health and alcohol issues. ¶ 82. Of four brothers one is dead from substance abuse, one is estranged with mental health and substance abuse problems, and one is incarcerated in a serious child sex case.[1] This can hardly be said to be a normal outcome. Put differently, 75% of the children from his family of origin are dead from drugs or estranged for devastating reasons.

Importantly, Ed himself is acutely aware of the distinctions between his upbringing and that of many who find themselves before this Court. *Exhibit* B. While at Wyatt, he saw a new world:

> When I was at Wyatt…and participating in the group counseling, I heard others tell about their life and how they ended up incarcerated. Quite a few in the group had abusive, poor childhoods among other problems.

*Exhibit* B. While this is true, people have needs beyond the material. One thing Mr. Galpin may discover as he continues to progress through treatment is that there are harms and deprivations and we can see and those we cannot. He may begin to revisit where he views himself in this formulation. It appears there is reason to believe this is a legitimate area of inquiry.

---

[1] Moreover, counsel contacted Mr. Galpin's other brother, whose name is reflected in the *PSR* but counsel omits out of respect for his privacy and wishes, to confirm he did not want to provide any collateral information. He did not. However, he explained himself to counsel and stated that, as a result of his other brother's failings, the bar was so low for Mr. Galpin that all he had to do was to be normal but he could not even do that. While his anger and disappointment are understandable, it also seems to confirm a sense of a family more complex and emotionally burdened than Mr. Galpin perceives it.

### 3. Ed managed to connect himself to an emotionally intelligent support structure.

Two people stand out in the Ed's recent life: his wife Nicole and his uncle Scott Miterko. Each has submitted a character letter. *Exhibits* C (Nicole Galpin), D (Scott Miterko). But their relationship to Ed and observations warrant elaboration—particularly the nature of those relationships since his arrest.

Mrs. Galpin—Nicole—is now Ed's ex-wife. She filed for divorce on February 2, 2021. Divorce was granted in a default judgment on April 26, 2022 *after* the filing of the final draft of the *PSR*. ¶ 87. That decision was precipitated by Mr. Galpin's offenses as revealed by his arrest. Scott Miterko is one of Ed's maternal uncle's and has known Ed since his childhood.

Perhaps lost in prosaic language of the *PSR* and character letters, is that Nicole is a remarkable individual. Dr. Thompson, author of the evaluation, described her in one conversation with counsel as "amazingly nice and understanding given the upheaval this has caused." Through a nightmarish dissolution of her marriage, she has maintained her equanimity and distinguishes herself from many insofar as she can hold simultaneously in her mind both the odiousness of her ex-husbands acts and the love and support he has given many. Undersigned counsel first spoke with Nicole on June 25, 2020, the night following Mr. Galpin's arrest. While the FBI had already been to her home, counsel delivered the news regarding the scope and gravity of Mr. Galpin's circumstances.

Her initial reaction was clearly shocked and angered at the idea he would have a secret of this nature and proportion that so undermines the traditional expectations of marriage and fidelity. Simultaneously, she placed those feelings on hold and acted to assist counsel in representing Ed. She undertook considerable effort to furnish counsel with the makings of a bond package. More importantly, she explained Ed's personality and history to counsel in a way that Ed—who was

5

basically in shock—was unable to do. She called Ed early on when counsel had visits scheduled and insisted that Ed had to find it within himself to talk to his lawyer.

Now nearly two years removed, her anger has more fully crystallized. However, Nicole has not stopped being a friend to Ed nor a primary source of insight into his workings. While members of the defense are in awe at the quality of her character, the point of this section is not hagiography of Mrs. Galpin. The point is that the emotionally intelligent Nicole functions as an instructive foil for Mr. Galpin. She has continued to provide emotional support to Ed and insights to counsel. Moreover, the choice of such an emotionally balanced and articulate partner says something positive about Ed—he did not seek a person who enabled his flaws.

Similarly, Mr. Galpin's maternal uncle has assumed the role of "immediate family" since Mr. Galpin's arrest. Mr. Miterko has known Ed since childhood and had the opportunity to observe and interact with Ed's family of origin. His characterization of Ed's family is very different than Ed's. While Nicole's descriptions of Ed's family of origin are far more detailed, Scott's are consistent hers. *Exhibit* D (noting Ed's mother's inability to express any feelings and "I appreciate what it took for Ed to overcome that upbringing"). He describes his sister and her husband as emotionally distant and although materially secure.

   4. **Ed and his family from the eyes of his closet cohorts.**

Nicole describes him as coming from a family in which love was not freely expressed nor shown. *Exhibit* C, Letter of Nicole Galpin; *PSR*, ¶ 87. For example, Mrs. Galpin shared an anecdote with counsel about the first Christmas she spent with Ed when they were dating. She described his family and their holiday traditions as spartan and ascetic, apparently, in the tradition of the Russian Orthodox faith. Her family, by contrast celebrated in the "traditional Portuguese" fashion with lots of pomp and presents. Mrs. Galpin stated that her mother bought presents for Ed and saw that he

6

was included her family's traditions. When this happened, she said, that Ed broke down in tears and started sobbing. While her family was only doing what might be the expected of people trying to make guests feel welcome and included, Ed was completely overcome by the gesture because it was the first time someone showed him that level of care or concern. From Nicole's perspective, this anecdote exemplified how reserved and closed off the Galpin family could be---and perhaps explained where Ed's taciturn disposition came from.

Similarly, evidence suggests Ed may have become more closed off from his wife over time. Ed and his wife went through a devasting and unsuccessful struggle with infertility that may have had an emotionally alienating effect. Finally, there is some direct evidence that following the death of his father in 2016, Ed became more withdrawn as his wife observed to Dr. Robert Thompson. *Sealed Exhibit* A at 10. Importantly that sequence of events roughly corresponds with the offense conduct in this case.

### 5. Ed clearly had an isolated emotionally life in many respects.

*Sealed Exhibit* A contains the forensic psychological report of Dr. Robert Thompson. It includes a diagnosis and intimate details of the Mr. Galpin's life. Counsel refers to it obliquely as to avoid placing those details on the public records. Additionally, *PSR* ¶ 96 notes several events that are also reflected in the report. Once again, these clearly do not rise to the level of trauma given Mr. Galpin's subjective view of them but, could conceivably based on a person's perception of them.

Important to the defense theory is that the items reflected in these documents beget very difficult conversations. By all accounts, Ed struggled with seemingly routine conversations. *Exhibit* D ("Ed can be a bit stoic and reticent"); *PSR*, ¶87. Looking inward to question one's view of the world and the effects circumstances like these may—or may not—have had on his disposition and decision-making process were clearly substantial challenges for Ed.

7

### 6. A commitment to a different path and contrition.

Since his arrest, Ed has diligently grappled with his history and challenges. Mr. Galpin spent the first sixteen months of incarceration seeking rehabilitation and insight into his conduct. Specifically, he participated in a support group at Wyatt for those charged with sex offenses.[2] He reported that was helpful and meaningful to him. Similarly, he read a book at that was available at the facility entitled "*The Porn Trap: The Essential Guide to Overcoming Problems Caused by Pornography*," by Wendy and Larry Maltz. While counsel has not himself had an opportunity to read the book, coverage of it wildly describes it a thought provoking and helpful resource for men who engage in addictive, compulsive, and harmful pornography viewing. Mr. Galpin has stated that he recognizes himself in the patterns and phenomena described in the book and valued investigating those insights in structured therapy with similarly situated individuals.

But he did not stop there. First, while his evaluation with Dr. Thompson might be considered routine in a case of this nature, the fact that Ed was generally forthcoming and credible, in Dr. Thompson's view, is significant. Ed has to spend approximately 5 hours with a stranger over Zoom—once from the Bridgeport marshal's lockup which is far from discrete—sharing unbelievably personal details with Dr. Thompson. Similarly, in counsel's conversations with Nicole, Ed has sent her letters showing emotional availability, acceptance of the end of their

---

[2] On October 27, 2021 Mr. Galpin—along with seemingly every other sex offender at Wyatt—was transferred to the Connecticut Department of Corrections with Mr. Galpin going to Bridgeport Correctional Center (BCC). BCC has no treatment programs. The absence of any type of treatment or mental health counseling left Mr. Galpin despairing and he hopes to resume treatment as soon as possible.

marriage, and responsibility for his acts. Additionally, Ed has written a letter to the United States Attorney's Office's victim-witness coordinator that she can share, in her discretion, with any victim who wishes to read it. *Exhibit* F. That letter is based upon reading the available victim impact statements and reflecting on what his offense meant to those people and their families. Nor did Ed contest access to his assets and now $30,000 for restitution sits in the clerk's office. *PSR*, ¶ 108; *United States v. Garlich*, 951 F.2d 161, 163 (8th Cir., 1991)(sentencing courts have authority to depart based on extraordinary restitution). This is a major apology in the context of sentencing and warrants consideration. Finally, those close to Ed also describe him as showing contrition for his offenses.

Ed still has a great deal of work to do. However, at sentencing where the question is always, "why will the future be different?" there is reason to believe it will be. Dr. Thompson has stated that Ed has a "fair to good prognosis for improvement, *Sealed Exhibit* A, at 18, and have has done everything he can to lay a foundation for rehabilitation.

> 7. **There is evidence suggesting Mr. Galpin will be rehabilitated and he has identified circumstances he can address in furtherance of that goal.**

"Happy families are all alike; every unhappy family is unhappy in its own way." L. Tolstoy, "*Anna Karenina*." It is not yet clear where Ed Galpin's family falls in this formulation. Mr. Galpin holds the his view that his family was normal, healthy, and functional. But in a family where 75% of the children are either deceased from drugs, estranged, or incarcerated, there is a basis to reevaluate this perception. Mr. Galpin has committed, and begun, to do so. Assuming he concludes his family was unhappy, it begs the more difficult question of how, why, and in what way? Moreover, Ed's adult life has been marked by difficult events that, where many people may confide in support networks, Ed turned further inward. It is not clear to what extent his brother's death may have effected him but

9

one can certainly imagine the impacts such an event has on siblings—certainly the consequences of opioid overdoses are on regular display in our courts. Similarly, Ed and his wife went through a devasting and unsuccessful struggle with infertility that may have had an emotionally alienating effect. Finally, there is some direct evidence that following the death of his father in 2016, Ed became more withdrawn as his wife observed to Dr. Robert Thompson. *Sealed Exhibit* A at 10. Importantly that sequence of events roughly corresponds with the offense conduct in this case.

The defense has not staked its sentencing argument on any single event in Mr. Galpin's past. In fact, it would adamantly resist any characterization of its argument as an amalgamation of traumatic events that it speculates may have effected Mr. Galpin. The defense cannot undo what has been done. But what Mr. Galpin has done has been to open up about his life in unbelievably personal ways and begin to revisit the lessons he learned—good and bad—from these events. The work is not done. But all this court can do is take the measure of an individual's willingness to undertake these efforts as an indicator of rehabilitation and bulwark against future offending. By this standard, Mr. Galpin has done all he can and warrants the opportunity to see his efforts to completion.

II. **MR. GALPIN IS RIPE FOR REHABILITATION AND THE COURT SHOULD NOT CREATE ANY ADDITIONAL DELAYS IN THE DISPENSATION OF MEANINGFUL TREATMENT.**

A sentence of longer than 15 years will unnecessarily delay access to treatment. Therefore, it would be antithetical to rehabilitation. Mr. Galpin will undoubtedly receive sex offender treatment during his time in BOP. ¶¶ 137-38. The earliest he will begin to receive it, however, is June of 2031. The reason is because "[i]nmates ordinarily participate in the [two relevant] programs during the remaining 36-48 months of their sentence." *Id*; *see also* Bureau of Prisons, "*Sex Offenders*," available at https://www.bop.gov/inmates/custody_and_care/sex_offenders.jsp ("Offenders typically participate in sex offender treatment in the final three years of their incarceration"). Given that Mr.

10

Galpin was arrested in June of 2020, the earliest the last four years of his sentence could begin is June 2031. In the case of a 25-year sentence, for example, he would not *begin* to receive treatment until June of 2041.

There is no reason to further postpone treatment any longer than it will already be delayed. This would be antithetical to rehabilitation in violation of 18 U.S.C. § 3553(a)(2)(D) and, almost standing alone, would make a sentence of greater than 15 years "greater than necessary" to accomplish the purposes of sentencing. Importantly the defense provided Dr. Thompson with this information and he wrote:

> Clinically, it would be preferrable for him to start treatment as soon as possible, even if it means starting with individual therapy rather than programs participation, especially since he has shown an interest in treatment, appears to have motivation for treatment, and has made initial forays into it at the Wyatt Detention Facility.

*Sealed Exhibit* A at 19. The good news is that Mr. Galpin immediately engaged in treatment and seized the opportunities. The bad news is that is he has not consistently received access to it. The sentence in this case should not exacerbate this obvious structural problem.

### III. THE SENTENCING GUIDELINES ARE UNDULY—AND IRRATIONALLY—HARSH.

The Second Circuit has recognized that the United States Sentencing Commission's approach to child pornography is "fundamentally different" from its guidance with respect to most other offense and consequently, "unless applied with great care, can lead to unreasonable sentences that are inconsistent with what § 3553 requires." *United States v. Dorvee*, 616 F.3d 174, 184 (2d Cir. 2010). Specifically, the *Dorvee* court explained, "Sentencing Guidelines are typically developed by the Sentencing Commission using an empirical approach based on data about past sentencing practices. However, the Commission did not use this empirical approach in formulating the Guidelines for child pornography." *Id*. (citation omitted). This matter is a case in point: the

11

enhancements operate to hyperinflate—sometimes in redundant fashion—the guidelines offense level.

As Judge Pooler has articulated in a 2016 dissent, however, "much of the *Dorvee* court's criticism of the child pornography guidelines applies to the guidelines for production offenses as well. As with the guidelines for trafficking in child pornography found in Section 2G2.2, the Sentencing Commission did not use an empirical approach to develop the production guidelines found in Section 2G2.1. Instead, the Commission has increased the base offense level and added enhancements for production offenses 'usually as a result of congressional directives.'" *United States v. Brown*, 843 F.3d 74, 89 (2d Cir. 2016) (Pooler, J., dissenting). This is obvious in multiple ways in this case.

First, the politically rather than empirically driven harshness of the base guidelines in this case are further exacerbated by application of USSG § 4B1.5, which piles on an additional 5-level enhancement. *PSR*, ¶ 64. This enhancement is likewise a creature of politics, as the Commission acknowledges in noting that "section 632 of Public Law 102–141 and section 505 of Public Law 105–314 directed the Commission to ensure lengthy incarceration for offenders who engage in a pattern of activity involving the sexual abuse or exploitation of minors." USSG § 4B1.5 (background). And like the child pornography guidelines generally, the political nature of this enhancement leads it to recommend outcomes that are not just or rational.

In a particularly cruel irony here, the structure of § 4B1.5 is such that Mr. Galpin would face a *lower* recommended guidelines range if he had a prior history of committing sexual offenses. To say that again: under the Guidelines, Mr. Galpin is *worse off* for not having a prior sex offense conviction.

To elaborate: Section 4B1.5 contains two subsections. The first, § 4B1.5(a), applies "[i]n

12

any case in which the defendant's instant offense of conviction is a covered sex crime, §4B1.1 (Career Offender) does not apply, and the defendant committed the instant offense of conviction subsequent to sustaining at least one sex offense conviction." Under this provision, for the offense here Mr. Galpin would face the higher of his ordinarily calculated offense level/criminal history or an offense level of 34 and Criminal History Category of V. Here, that would lead Mr. Galpin to an offense level of 47 (prior to acceptance and reduction for being in excess of 43) and a Criminal History category of I, resulting in a recommended sentence of 360 months – life.

Subsection (b) applies "[i]n any case in which the defendant's instant offense of conviction is a covered sex crime, neither §4B1.1 nor subsection (a) of this guideline applies, and the defendant engaged in a pattern of activity involving prohibited sexual conduct[.]" Application of § 4B1.5(a), under this framework, prevents (b) from applying. Unlike (a), however, subsection (b) does not create minimum floors; rather, it increases the offense level by 5 levels. The effect here is to push Mr. Galpin's offense level well off the chart and landing him with a recommended "life" sentence under the guidelines.

Second, the §4B1.1 conduct is seemingly already accounted for in ¶32, the § 2G2.2(b)(5) enhancement. This enhancement already adds 5 additional levels. This means that Mr. Galpin now has a total of 10 additional levels as a result of multiple acts. It does not stop there.

Third, Mr. Galpin received a total of 6 additional levels (now a total of 16 additional levels) because of the age of the minors depicted. ¶¶ 29, 31. He received two under §2G2.2(b)(2) because victims were under 12; then he received 4 more because certain images depicted penetration of children under 10, § 2G2.2(b)(4)(A)—which would seem to be contemplated in the first enhancement. The *Dorvee* court noted that §2G2.2(b)(2) is one of the enhancements that nearly always applies. 616 F.3d at 186. Similarly, upon information and belief, Judge Arterton recently

13

found that §2G2.2(b)(4)(A) did not apply on similar facts in Doc. No. 75, *United States v. Torres*, 3:21-cr-139(JBA)(March 25, 2022). While these characteristics are undoubtedly abhorrent, 6 levels—two of which are redundant—is excessive.

Fourth, he received two more levels for use of a computer. ¶33; ¶ 2G2.2(b)(6). This enhancement is a relic of a different era: it is now practically impossible to commit this offense without the use of a computer. Computers are now ubiquitous and hardly qualify as a bona fide aggravating fact. *See Dorvee*, 616 F.3d at 186; *United States v. Henderson*, 649 F.3d 955, 961 (9th Cir., 2011)(commission criticized enhancement because it failed to distinguish between commercial and run-of-the-mill distribution).

Fifth, Mr. Galpin received another 5 levels on the theory he possessed 73,870 images. ¶ 34. While correct as a function of the Guidelines, reality defrocks this as any meaningful measure of culpability. Mr. Galpin had only 972 unique videos on his device. This number grossly overstates his culpability.

Sixth, the cumulative effect of these enhancements is that that they operate to deprive Mr. Galpin of any meaningful benefit for accepting responsibility. Because they easily exceed the 43 point threshold, on cumulative and questionable grounds, he receives no actual considerations for pleading guilty and accepting responsibility in a case where that is an essential part of a rectifying his acts and relieving the government of the burdens of potential multi-district litigation.

Though correctly calculated, the guidelines are a weak currency that vastly inflate the harm done in this case. This case calls out for exercise of the court's authority under *Booker* and *Kimbrough*.

IV. **THE CONDITIONS OF RELEASE SHOULD ACCOUNT FOR MR. GALPIN'S FIRST AMENDMENT RIGHTS, EMPLOYMENT NEEDS, AND TECHNOLOGICAL AND PERSONNEL CHANGES DURING THE PENDENCY OF HIS SENTENCE.**

The probation office's proposed condition in *PSR*, ¶157 is overbroad and overly burdensome of Mr. Galpin's political rights and employment needs. Moreover, it fails to account for the nearly presumptive changes in the technology and its role in daily life that will occur in the coming decades. Importantly, *Mr. Galpin is not objecting to the core principle of the condition: he does not seek unsupervised contact with minors*. However, electronic communication is now inseparable from our daily lives in the personal, employment, and political contexts. It is not fair to burden Mr. Galpin with the duty to know any-and-all of the ways in which these communications may incidentally generate contact with minors. Accordingly, he objects to the condition as written.[3]

First, the condition, as written, is overbroad as to Mr. Galpin's First Amendment rights. For example, were Mr. Galpin to make a political statement on a social media platform that requested people to take some type of action—or participate in a campaign that include a mass text or email send—that could conceivably violate the proposed condition. Suppose Mr. Galpin were to post on Facebook, "Student loans represent generational theft insofar as they commodify the means of upward mobility and strip surplus value from young workers to enrich the old at the expense of the young; like if you agree!" Or if he posted "The failure to address global warming will forever stain the legacy of the Baby Boomer generation and no one under the age of 45 should forget that fact, help me contact our congresspeople to right this wrong!" These would both theoretically violate the proposed condition: both are directed at young people as a class and neither specifically excludes the sub-class of young people under the age of 18; both request some type of follow up action that could be construed as contact or communication. Moreover, there is no legitimate basis to require Mr. Galpin

---

[3] Counsel and the government are involved in good-faith conversations to propose mutually agreeable language.

to exclude the subset of young people who may be under the age of 18: first, a critical part of the first amendment is the associational right that permits people to organize into democratically powerful groups not only vote but undertake the labor that organizing requires; second, statements such as these would have their greatest political value in the months prior to an election and is conceivable that the message could legitimately target someone who was 17 at that time of its delivery but would be 18 at the time of the election; and, third, the subject matter in these posts effects many people irrespective of whether they reached the age of majority. The ways in which this condition could burden innocent exercise of Mr. Galpin's political rights are incalculable in violation of *Packingham v. North Carolina*, _ U.S. _, 137 S.Ct. 1730 (2017).

Second, this would overburden Mr. Galpin's ability to seek employment. The *Packingham* court noted "[o]n LinkedIn, users can look for work, advertise for employees, or review tips on entrepreneurship." 137 S.Ct.1736. Internet access, regardless of the platform, is becoming essential for employment search. Indeed, in counsel's experience, most defendants recently released from prison that have a minimum job application requirement as a condition of supervised release use Indeed.com to apply for jobs. Moreover, Mr. Galpin—now 40 years old, lacking a college degree, and unlikely to be in the workplace until at least his 50s—is not likely to be seeking high-skilled jobs upon release. This means, the chance that a 17 year may be on the other end of an Indeed.com application in a mere processing role, is reasonably foreseeable. This too would violate the condition as written but further no legitimate legal interest.

Third, none of us can foresee the state of technology for its uses in the 2030s—Mr. Galpin's earliest conceivable release date. The first iphone was release on June 29, 2007. A. Montgomery, "*The evolution of Apple's iPhone*," Computerworld, Sept. 23, 2021 available at https://www.computerworld.com/article/2604020/the-evolution-of-apples-iphone.html#slide2.

This means that Mr. Galpin will serve a sentence at least at long as the smartphone was been part of our society. The way probation has written this condition, it is overbroad under current law. However, it is inconceivable how far it may exceed the law's bound given presumptive advancements in technology over the next decade or more.

Fourth, the probation officer misapprehends *Packingham* in her addendum. True though it may be that the court referred to "commercial social networking Web site," the elevates substance over form and completely misses the point of the decision. First, the phrase commercial social networking site is hopelessly vague. Second, the condition, as written, forbids "social media, mobile application, the Internet, or other electronic means." ¶ 157. Not only is this redundant—to counsel's knowledge, the Internet includes encompasses social media and mobile applications—these phrases would include Facebook, Twitter, LinkedIn, Indeed, TikTok, Monster.com, any individual job application platforms employers may use, and any other platform that will almost certainly arise in the next decade or more. The point of *Packingham* was not to vindicate access to Facebook particularly, the point was vindicate internet platforms as modern public squares. Probation's conditions cannot gratuitously and imprecisely burden those rights.

V.     **CONCLUSION.**

Mr. Galpin will not be released from prison until the 2030s at the earliest. His journey to rehabilitation will be a long and arduous one. While the currency of the Guidelines is hyper-inflationary in the child pornography context, Mr. Galpin appears at sentencing with earnest money—the asset of real effort at meaningful pursuits—in support of his rehabilitation. He has not served a day in prison in his life prior to this offense and fifteen years is a *very* severe sentence for anyone. The period of incarceration will provide retribution and general and specific deterrence. Not only will it provide Mr. Galpin ample time for rehabilitation, each day past 15 years unnecessarily postpones

17

the treatment he needs and undermines the very rehabilitation the law requires. Accordingly, that sentence is sufficient but not greater than necessary and should be imposed.

Respectfully Submitted,

THE DEFENDANT
EDWARD GALPIN

/s/Daniel M. Erwin/s/
By Daniel M. Erwin (ct28947)
FEDERAL DEFENDER'S OFFICE
10 Columbus Boulevard, 6th Floor
Hartford, CT 06106
Tel: (860) 493-6260
Fax: (860) 493-6269
Email: Daniel_Erwin@fd.org

CERTIFICATION OF SERVICE

This is to certify that on May 7, 2022 , a copy of the forgoing was filed electronically via the Court's CM/ECF system, and by that system, counsel for the Government has been provided with a copy of the forgoing.

/s/Daniel M. Erwin/s/
Daniel M. Erwin