UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA

vs.

EDWARD GALPIN

CRIMINAL NO. 3:21-CR-26(JAM); 3:21-CR-32(JAM)

May 19, 2022

**REPLY TO GOVERNMENT'S SENTENCING MEMORANDUM**

A person reading the government's sentencing memorandum might be surprised to learn that Mr. Galpin pled guilty, wrote two letters of apology, was expected to address the Court at sentencing, and had undergone all of the therapy that *state action* permitted. Nowhere in the defense sentencing materials does anyone "rationalize" or "justify" Mr. Galpin's conduct. *Government's Memorandum*, at 2. It acknowledges the egregiousness of his conduct and contends that a sentence of 15 years is sufficient but not greater than necessary. It attempts to examine why a person might do this and what he needs in the future. Moreover, the government departs from the evidence and speculates that there are more victims and then takes the astonishing step of recasting his apology to the victims as an act of denial. *Id*. at 1, 8-10. Finally, it insinuates that defense mitigating evidence must have a causal relationship with the offense conduct; this is not legally correct.

The defense files this memorandum to: (1) address actual sentences given in this district and the Second Circuit for child sex offenses; (2) object to the government's characterization of Mr. Galpin's apology; and (3) object to any causal nexus standard for mitigating evidence.

## I. NO ARTICULABLE PRINCIPLE GUIDES THE GOVERNMENT'S REQUEST FOR 40 YEARS.

The government spares no ink excoriating the defense for the modest criticisms of the countless guidelines enhancements it insisted upon. But then, it abruptly concludes that a 40-year

sentence is warranted stating that it is not asking for life. There are two problems with this. First, a 40-year sentence is an effective life sentence for a 40-year-old: its promise of relief is illusory. This is simply the elevation of form over substance: the government knows that the Court's sentence must be consistent with *United States v. Dorvee*, 616 F.3d 174 (2d Cir., 2010); it simply asks the Court to do with *Booker* authority what it cannot easily do with its guidelines authority—packaging it is a windfall to the defendant. That is not the measured analysis the Second Circuit had in mind. Second, this is a tacit admission that the guidelines *do* overstate the offense.

Given the government clearly agrees—by virtue of its request for one--that a non-guidelines sentence is appropriate, the question is: why that sentence? The government states *no reason* why the sentence should nonetheless be inflated by 25 years, from the mandatory minimum, once removed from the realm of the guidelines. Importantly, the government cannot cite a single contact victim that claims she fears Mr. Galpin ands needs him incarcerated for life in order to feel safe. While the defense does not concede that such a representation warrants such a sentence, courts have considered this fact to be important in past cases. It is not present here and the government offers no such analysis.

The defense is in partial agreement with the government's formulation of the offense conduct as consisting of "buckets" relating to child pornography possession and distribution and production. *Government's Memorandum*, at 7-8. Its conclusions, however, are deeply. The outcomes of actual cases must be parsed evaluate the value of this case outside of the guidelines. Accordingly, the defendant begins with the least serious child sex offense cases and builds to the some of the most serious.

Begin with possession cases. It is common in the district for simple possession of child pornography, even extensive collections, to receive sentences at or near 60 months. For example, in

*United States v. Richard Doyle*, 3:13-cr-227(MPS) this court varied downward to 60 months from a sentencing range of 210 to 240 months and an offense level of 37 (600 images) in the case of a 64 year-old man who worked as a teacher for 35 years. Similarly, in *United States v. Parilla*, 3:12-cr-140(VLB) this court sentenced a 49 year-old physician to 60 months, similarly varying downward—by 140 months—from a sentencing range of 210 to 240 months and an offense level of 37. In *United States v. Pearce*, 3:12-cr-59(SRU), Judge Underhill imposed a sentence of 60 months varying downward from guidelines range of 70 to 87 months based upon possession of 10 to 149 images. *See* Doc. No. 14 (plea agreement). While the defendant concedes that distribution is worse than possession, these cases set a baseline.

Obviously, this case does not stop with simple possession—but that does not mean it automatically accelerates to an effective life sentence. There are a litany of cases in which men have (1) either traveled to meet someone who was underage for sex; or (2) attempted to entice a minor online. While the charging decisions in these cases vary—travel offenses versus enticement—the core conduct and harms are similar: defendants go from viewing material to actually, or attempting, to harm children in real life. In *United States v. Brand*, 467 F.3d 179 (2nd Cir., 2006) a New York District Court imposed a sentence of 60 months on a 36 year old defendant who traveled to New York City to meet an FBI agent he believed to be a 13 year old girl. Similarly, in *United States v. Han*, 230 F.3d 560 (2nd Cir., 2000), a defendant received 18 months *after trial* for traveling to meet and undercover law enforcement officer he believed to be 13. Similar facts led to a 40-month sentence in *United States v. Hawkins*, 513 F.3d 59 (2nd Cir., 2008). In *United States v. Johnson*, 221 F.3d 83 (2nd Cir., 2000) a defendant convicted of multiple sex offenses including possession, enticement, and travel received a sentence of 88 months. Similarly, a defendant convicted of travel

and enticement, with a 10 year old victim, after trial received 81 months in *United States v. Hook*, 1998 LEXIS 12931 (2nd Cir., 1998).

Recent, local data reflects a similar trend. In *United States v. Murphy*, 3:16-cr-227(VLB), Judge Bryant imposed a sentence of 60 months on a man who traveled from Rhode Island to Connecticut and had sex, twice, with a teenage girl. The case was reversed on appeal for reasons unrelated to the sentence and the defendant later entered a F.R.C.P. 11(c)(1)(C) plea for time served. Last year, Judge Bryant sentenced a man for receipt of child pornography who had also attempted to entice a teenage girl to 84 months with a guidelines range of 108 to 120 months. *United States v. Bacon*, 3:20-cr-237(VLB). In *United States v. McCoy*, 2020 U.S.Dist.LEXIS 193993 (D.Ct., 2020), Judge Shea recalled a non-guidelines sentence of 156 months was imposed in an enticement case based upon a *Dorvee* rationale where the government had dropped a production count.

Cases that have resulted in sentences of 30 years are also instructive. For example, in *United States v. Dos Reis*, 369 F.3d 142 (2nd Cir., 2004), the Second Circuit affirmed Judge Underhill's upward departure, from 87 months, to an effective sentence of 30 years (120 months and 180 months consecutive) where a 24 year old defendant traveled from New York to Danbury to have sex with a 13 who *he killed* during sex while the two engaged in asphyxiation. Recently, Judge Chatigny gave, what he called, the longest sentence of his career: 30 years for production of child pornography where the defendant filmed himself raping his 6-to-8-year old daughter and abusing another child over the course of a year. *United States v. McGuire*, 3:20-cr-153(RNC). In *United States v. Acosta Torres*, 3:21-cr-139(JBA), Judge Arterton sentenced a defendant to 30 years where he pled to sexual exploitation of a minor and was a level 42 on the guidelines; however, Mr. Torres

produced child pornography by raping multiple young child (beginning at age 6) over the course of years.

Mr. Galpin clearly has a place on the spectrum of sex offenses. Clearly, his offense is worse than simple possession. It falls far short, however, of the conduct of defendants Dos Reis, McGuire, and Acosta Torres. The defense does not think it provocative to say the worst part of this offense is the new victimization Mr. Galpin added to the internet and the surreptitious recording of those victims. However, those victims were all teenagers—in comparison to 6-to-8-year-olds—and the sex acts themselves did not involve violence; only one case involved actual contact and that individual was 17. *See United States v. Muzio*, 966 F.3d 61, 78 (2d Cir., 2020) *Underhill, J.* dissenting (articulating 10 part test for evaluating seriousness of child pornography production). This places Mr. Galpin in the middle of range of culpability for acts that have resulted in sentences of 5 to 30 years. He request for 15 years is entirely reasonable in light of actual data.

## II. THE GOVERNMENT HAS NO BASIS TO PARSE MR. GALPIN'S HEARTFELT APOLOGIES.

Not captured in the *PSR* is that Mr. Galpin *bawled* during at least one-third of the 45 minute presentence interview. It is completely out of bounds for the government to question Mr. Galpin's remorse. First, this is wrong as matter of legal foundation: Mr. Galpin's apology letter to the victims is based largely on, and in response to, the available victim impact statements. Those are limited to cases documented through NCMEC. Had the contact victim's submitted *anything*, the defense would have reviewed that with Mr. Galpin as well and he would have responded. But they—including one who we now learn apparently has no recollection of the crime—have not said anything. An apology is an attempt to respond victim's pain, not the government's outrage. While Mr. Galpin is sorry and remorseful for all he did, the defense made a good faith attempt to respond

to what was available. Similarly, the government has no psychological expertise upon which to evaluate anyone's apology. It has simply become the prosecutorial fashion to critique defendants' apologies, which is what the government does here. There is no principled reason to question Mr. Galpin's attempts to apologize to his victims.

Second, the emotional depth Mr. Galpin has recently summoned is largely the result of treatment and therapy. But that therapy stopped on October 28 of 2021 when all sex offenders were transferred out of Wyatt. Perhaps had Mr. Galpin this continuing opportunity, his apology would be more to the government's liking. Once again, the defense hopes that further treatment will not be delayed as Mr. Galpin does show capacity to connect with the consequences of his actions.

Third, the government's characterization of Mr. Galpin's apology as lacking credibility is neither a fair nor literate reading of his letter. *See Government's Memorandum*, at 10. Mr. Galpin acknowledged that he rationalized and minimized his conduct to permit him to continue it. That is not uncommon in these types of cases. Clearly, it is not acceptable to delude oneself into believe one's actions are harmless when in fact the create and enable harm. But acknowledging this self-deceit and denial is a critical first step to rehabilitation and, in some cases, restorative justice. It is not a credit to our system when shows of contrition are turned into prosecutorial bludgeons.

## III. THE GOVERNMENT MISAPPREHENDS THE LAW WHEN IT APPLIES A CAUSATION STANDARD TO MR. BACON'S POTENTIAL CHILDHOOD TRAUMAS AND OFFENSE CONDUCT.

The defense is not required to show a causal connection between Galpin's childhood trauma and his offense. This formulation of mitigating evidence runs afoul of the law and confuses culpability with liability. *Government's Memorandum*, at 15. There is no legal requirement that mitigation in the form of childhood trauma need satisfy the strict proximate cause analysis of medical malpractice and tort law. Fundamentally, the government seeks to avoid and distract by recasting the defense's

mitigation as an absurdity. Eighteen U.S.C. § 3553(a)(1)'s command is that the court consider "the nature and circumstances of the offense *and* the history and characteristics of the defendant," provide for rehabilitation, and § 3661 eschews any limitation on consideration of a defendant's background. It is conceivable that childhood traumas contributed to Mr. Galpin's offense. But it is similarly conceivable that removing his emotional barriers is essential to rehabilitation from mere acts of selfishness. Accordingly, the defendant reviews the law on this issue.

First, the Supreme Court has roundly rejected causal nexus tests for mitigation evidence in the Eighth Amendment context. *Tennard v. Dretke*, 542 U.S. 274, 283-87 (2004); *Smith v. Texas*, 543 U.S. 37, 45 (2004)(per curiam). "These cases hold that requiring a defendant to prove a nexus between mitigating evidence and the crime is 'a test we never countenanced and now have unequivocally rejected.'" *Poyson v. Ryan*, 879 F.3d 875, 887 (9th Cir. 2018) quoting *Smith*, supra, 543 U.S. at 45.

> In *Atkins v. Virginia*, [536 U.S. 304, 316 (2003)] we explained that impaired intellectual functioning is inherently mitigating: "[T]oday our society views mentally retarded offenders as categorically less culpable than the average criminal." Nothing in our opinion suggested that a mentally retarded individual must establish a nexus between her mental capacity and her crime before the Eighth Amendment prohibition on executing her is triggered. Equally, we cannot countenance the suggestion that low IQ evidence is not relevant mitigating evidence--and thus that the *Penry* [*v. Lynaugh*, 492 U.S. 302 (1989)] constitutional relevance question need not even be asked--unless the defendant also establishes a nexus to the crime.

*Tennard*, supra, 542 U.S. at 287. In *Tennard* and *Smith*, the Supreme Court reversed the Fifth Circuit's policy of a requiring state death row inmates to show a causal nexus between their mental impairment and their offenses before it could be considered in the death penalty phase of a capital trial: "There is no question that a jury might well have considered petitioner's IQ scores and history of participation in special-education classes *as a reason to impose a sentence more lenient* than death. Indeed, we have held that a defendant's IQ score of 79, a score slightly higher than petitioner's, constitutes

relevant mitigation evidence." *Smith*, supra, 543 U.S. at 33 (emphasis added, internal cites omitted). Accordingly, the relevance of evidence that the petitioner's low IQ and learning disabilities was "plain for mitigation purposes under our precedents, event those predating *Tenard*." *Id*. at 45 citing *Penry I*, supra, 492 U.S. at 319; *Payne v. Tennessee*, 501 U.S. 808, 822 (1991); *Boyde v. California*, 494 U.S. 370, 377-80 (1990); *Eddings v. Oklahoma*, 455 U.S. 104, 114 (1982).

Second, the government's theory is similarly at odds with 18 U.S.C. § 3553(a). As a preliminary matter, the Eighth Amendment principles articulated in the *Tennard* cases must be read into § 3553(a) pursuant to the principle of constitutional avoidance: "It is a tool for choosing between competing plausible interpretations of a statutory text, resting on the reasonable presumption that Congress did not intend the alternative which raises serious constitutional doubts." *Clark v. Suarez Martinez*, 543 U.S. 371, 381 (2005). Accordingly, any distinction between the two sources of law is one without a difference. Next, the plain language of § 3553(a) contains a conjunctive test requiring the district court to consider *both* the seriousness of the offense *and* the history and characteristics of the defendant. Moreover, 18 U.S.C. § 3661 states that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." Pursuant to the plain language of § 3553(a), the court is required to balance the defendant's history and characteristics and the need for rehabilitation against the seriousness of his offense. Moreover, the imposition of a causal nexus is a limitation that runs afoul of § 3661. The government misapprehends constitutional principles and the plain language of the relevant statutes.

The defense has been clear from the beginning it was presenting an inventory of hypotheses. Those hypotheses demonstrate Mr. Galpin's efforts at rehabilitation and potential for doing so as he continues to endeavor. Whether they identify causes or mere potential for growth that will insulate

against wrongdoing, Mr. Galpin will have opportunities in BOP treatment—hopefully sooner rather than later—to determine which are valid and which are not. In the meantime, the law need be applied accurately.

**IV. CONCLUSION.**

This defense concludes where it began: this is a case about values and value. The government admirably seeks to vindicate the value of protecting children from the worst acts. But our system's ability to dispense justice in a measured and sober fashion is a similarly enduring value. It must withstand the temptation to give excessive sentences in inflammatory circumstances. To that end, the Second Circuit has already recognized that the child pornography guidelines have a hyperinflationary effect. *Dorvee*. The government's request that the Court do by §3553a what it ought not by the Guidelines, is simply an invitation to tie our system's gold standard to a weak currency. The court should decline that invitation.

"[T]he life of the law has not been logic: it has been experience." O. Holmes, *The Common Law* 1 (1881); *Johnson v. United States*, 576 U.S. 591, 601 (2015). *No one disputes the criminality nor seriousness of Mr. Galpin's offense*. Experience, however, teaches that this conduct falls in the middle range of child sex offenses in this district that result in sentence between 5 and 30 years. The government's request of 40 years is not remotely calibrated to these standards. A sentence of 15 years is sufficient but not greater than necessary to accomplish the purposes of sentencing.

Respectfully Submitted,

THE DEFENDANT
EDWARD GALPIN

/s/Daniel M. Erwin/s/
By Daniel M. Erwin (ct28947)
FEDERAL DEFENDER'S OFFICE
10 Columbus Boulevard, 6th Floor

Hartford, CT 06106
Tel: (860) 493-6260
Fax: (860) 493-6269
Email: Daniel_Erwin@fd.org

CERTIFICATION OF SERVICE

This is to certify that on May 19, 2022, a copy of the forgoing was filed electronically via the Court's CM/ECF system, and by that system, counsel for the Government has been provided with a copy of the forgoing.

/s/Daniel M. Erwin/s/
Daniel M. Erwin